# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT ) | |
| OPPORTUNITY COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 1:22-cv-00002-HSO-RHWR |
| ) | |
| HUNTINGTON INGALLS INDUSTRIES, INC.; ) | |
| HUNTINGTON INGALLS INCORPORATED; ) | |
| AND NSC TECHNOLOGIES, LLC ) | JURY TRIAL DEMAND |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e et seq., and Title I of the Civil Rights Act of 1991, 42 U.S.C. §1981a, to correct unlawful employment practices on the basis of sex (female) and to provide appropriate relief to Victoria Sellers and Shontell Coleman (collectively referred to as "Charging Parties") and a class of female employees (collectively referred to as "the Class") who were adversely affected by such practices. As alleged with greater particularity below, Defendants Huntington Ingalls Industries, Inc. ("Industries"), its wholly owned subsidiary Huntington Ingalls Incorporated ("Incorporated"), and NSC Technologies, LLC ("NSC") subjected Charging Parties and the Class to harassment because of sex. Defendants also unlawfully retaliated against Victoria Sellers by terminating her employment for opposing the sexual harassment. Defendants Industries and Incorporated also

unlawfully retaliated against Shontell Coleman when their supervisor threatened her life because she opposed his unlawful conduct.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sections 2000e-5(f)(1) ("Title VII"), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the Southern Division of the United States District Court for the Southern District of Mississippi, and employment records relevant to such practices are maintained and administered in this jurisdiction.

## PARTIES

3. Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII, and is expressly authorized to bring this action by Section 706(f)(1) and (3) of Title VII, 42 U.S.C. Section 2000e-5(f)(1) and (3).

4. NSC is an industrial staffing firm organized as a Virginia limited liability company. At all relevant times, NSC has continuously been doing business in Mississippi, has continuously been registered with the Mississippi Secretary of State to do business in Mississippi, and has continuously had over 15 employees.

5. Industries is a military shipbuilding company organized as a Delaware corporation. At all relevant times, Industries has continuously been doing business in Mississippi and has continuously had over 15 employees. At all relevant times, Industries was registered with the

Mississippi Secretary of State to do business in Mississippi until it withdrew its registration on January 26, 2018.

6. Incorporated is a military shipbuilding company organized as a Virginia corporation. At all relevant times, Incorporated has continuously been doing business in Mississippi, has continuously been registered with the Mississippi Secretary of State to do business in Mississippi, and has continuously had over 15 employees.

7. At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

8. At all relevant times, Incorporated has been an alter ego of Industries, and Industries and Incorporated have constituted an integrated enterprise ("Huntington Ingalls"):

 a. Industries and Incorporated have interrelated their operations.

 b. Industries and Incorporated have centralized control of labor relations.

 c. Industries and Incorporated have common managers.

 d. Industries and Incorporated have common ownership.

 e. Incorporated has continuously been a wholly owned subsidiary of Industries.

 f. Industries and Incorporated share the same headquarters.

 g. C. Michael Petters serves as President and CEO of both Industries and Incorporated.

 h. Charles R. Monroe, Jr. serves as Secretary of both Industries and Incorporated.

 i. D. R. Wyatt serves as Treasurer of both Industries and Incorporated.

 j. Industries and Incorporated have presented themselves to the public and employees as a single entity.

k.      Industries and Incorporated do not deal with one another at arms' length.

l.      Industries and Incorporated share social media accounts and a single Internet domain, huntingtoningalls.com (the "Huntington Ingalls Website").

m.      Huntington Ingalls' shipbuilding operations in and around Pascagoula, Mississippi are branded as "Ingalls Shipbuilding" and invariably described to the public as "a division of Huntington Ingalls Industries."

n.      Ingalls Shipbuilding occupies 800 acres of land in Mississippi.

o.      Approximately 11,500 employees work at Ingalls Shipbuilding.

p.      Huntington Ingalls is the largest manufacturing employer in Mississippi and one of the largest employers in the state overall.

q.      The Huntington Ingalls Website has listed job postings for Ingalls Shipbuilding that state the recruiting and hiring entity is Industries.

r.      Industries directly employs persons who work in or around Pascagoula, Mississippi.

s.      The biography of Edmond E. Hughes on the Huntington Ingalls Website identifies him as "vice president, Human Resources & Administration (HR&A) for Ingalls Shipbuilding, a division of Huntington Ingalls Industries."

t.      Employees of Incorporated are promoted to positions with Industries.

u.      The President of Ingalls Shipbuilding is an Executive Vice President of Industries. These positions are currently held by Kari Wilkinson and were previously held by Brian Cuccias, including during the relevant period. Both Wilkinson and Cuccias were promoted into these positions after holding other positions with Ingalls Shipbuilding.

v.  The Program Manager for the U.S. Coast Guard National Security Cutters relevant to this lawsuit presents himself as an employee of Industries.

w.  The Huntington Ingalls employees who investigated the conduct alleged in this complaint publicly identify themselves as employees of Industries.

x.  Industries publishes a Code of Ethics and Business Conduct, which includes policies concerning sexual harassment, that it distributes and applies to persons directly employed by Industries or Incorporated.

y.  Industries regularly published and distributed updates on ethics issues to persons directly employed by Industries or Incorporated.

z.  Ingalls Shipbuilding instructed employees and other persons affiliated with Huntington Ingalls to contact a hotline maintained by Industries to report ethics concerns, including potential violations of federal anti-discrimination statutes (the "Huntington Ingalls Hotline").

aa.  Industries maintains a single "Employee Information Phone Line" to be used by persons directly employed by Industries or Incorporated.

bb.  Industries negotiates the five collective bargaining agreements that apply to Ingalls Shipbuilding.

cc.  Industries oversees and manages workforce development for Incorporated.

dd.  Industries develops and manages Incorporated's personnel policies.

ee.  Industries may freely access personnel records maintained by Incorporated.

ff.  Industries agreed in July 2019 to pay back wages and interest to resolve alleged systemic hiring discrimination violations found in a routine compliance evaluation of the

Pascagoula, Mississippi shipyard by the U.S. Department of Labor's Office of Federal Contract Compliance Programs.

gg.   Industries determines compensation and benefits for employees of Industries and Incorporated.

hh.   Industries negotiates common discounts for persons directly employed by Industries or Incorporated.

ii.   Industries has sponsored at least one retirement savings plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") for persons directly employed by Incorporated.

jj.   Incorporated has not sponsored any retirement savings plan pursuant to ERISA for persons it directly employs.

kk.   Industries has sponsored at least one health insurance coverage plan pursuant to ERISA for persons directly employed by Incorporated.

ll.   Incorporated has not sponsored any health insurance plan pursuant to ERISA for persons it directly employs.

mm.   Industries has sponsored at least one life insurance coverage plan pursuant to ERISA for persons directly employed by Incorporated.

nn.   Incorporated has not sponsored any life insurance coverage plan pursuant to ERISA for persons it directly employs.

oo.   Industries pays disability benefits for persons directly employed by Industries or Incorporated who are injured at work.

pp.   Industries operates the Huntington Ingalls Industries Scholarship Fund for dependent children of persons directly employed by Industries or Incorporated.

qq. Industries operates Family Health Centers that provide healthcare services to persons directly employed by Industries or Incorporated.

rr. Industries oversees, coordinates, and manages Incorporated's bidding on government shipbuilding contracts.

ss. Industries oversees, coordinates, and manages relations with government contracting officials on behalf of Incorporated, including providing updates and managing expectations as to Incorporated's work.

tt. Industries maintains and operates an Organizational Conflict of Interest system that routes proposed statements of work throughout the entire company, including Incorporated, whenever a business unit wishes to bid on a government contract.

uu. Industries and Incorporated share office space at the Pascagoula, Mississippi shipyard.

vv. Industries manages marketing and advertising for Incorporated.

ww. Industries advertises ships built by Ingalls Shipbuilding, including the U.S. Coast Guard National Security Cutter relevant to this lawsuit, as having been built by Industries.

xx. Industries provides professional services, including legal services, to Incorporated.

yy. Industries consolidates its financial statements with those of its subsidiaries.

zz. Industries and Incorporated commingle inventories.

aaa. Industries prepares Incorporated's books and other financial records.

bbb. Industries prepares Incorporated's income tax filings.

ccc. Industries prepares Incorporated's filings with the Mississippi Secretary of State.

9. At all relevant times, all Defendants were joint employers of Charging Parties and the Class.

## ADMINISTRATIVE PROCEDURES

10. More than thirty days prior to the institution of this lawsuit, each Charging Party filed a charge with the Commission alleging violations of Title VII by Defendants.

11. At all relevant times, Defendants Industries and Incorporated have held themselves out as one entity operating in an integrated manner and responding substantively as a single entity, Huntington Ingalls, to the Charging Parties' charges of discrimination.

12. At all relevant times, because Defendants Industries and Incorporated operated in conjunction with one another as an integrated enterprise, Huntington Ingalls, and as a single "employer" within the meaning of Title VII, Defendants Industries and Incorporated had notice of the charges filed by Charging Parties and all subsequent developments in the administrative process.

13. On May 11, 2021, the Commission issued to the Huntington Ingalls Defendants and NSC Letters of Determination finding reasonable cause to believe that Title VII was violated and inviting them to join the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

14. In its efforts to conciliate, the Commission engaged in communications with each Defendant to provide it with the opportunity to remedy the discriminatory practices described in the Letters of Determination.

15. The Commission was unable to secure from Defendants a conciliation agreement acceptable to the Commission.

16. On August 19, 2021, the Commission issued to the Huntington Ingalls Defendants a Notice of Failure of Conciliation regarding each charge advising the Huntington Ingalls Defendants that

the Commission was unable to secure from the Huntington Ingalls Defendants conciliation agreements acceptable to the Commission.

17. On August 26, 2021, the Commission issued to NSC a Notice of Failure of Conciliation regarding each charge advising NSC that the Commission was unable to secure from NSC conciliation agreements acceptable to the Commission.

18. All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

19. From at least as early as September 2017, and continuing until May 2018, Defendants have engaged in unlawful employment practices in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) and Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

20. Specifically, Defendants subjected Charging Parties and the Class to severe, pervasive, unwanted, humiliating, degrading and offensive sexual conduct, including sexual assault, based on their sex (female), while they were employed by Defendants and assigned to work at Huntington Ingalls' Pascagoula, Mississippi shipyard. The unlawful sexual harassment was perpetrated by a supervisor employed by Huntington Ingalls, Patrick Dingle.

21. Dingle was the Ship Superintendent on the seventh U.S. Coast Guard National Security Cutter under construction by Huntington Ingalls. That ship is also known as NSC 7, WSML 756, and USCGC Kimball.

22. Charging Parties and the Class were assigned to work on a cleaning crew for the Kimball.

23. The sexual harassment included, but was not limited to, the following sexually charged conduct that created a hostile work environment based on sex:

9

a. On an ongoing and continual basis, Dingle made unwelcomed sexual comments about the Charging Parties, the Class and other female employees, and about their bodies, groped them, exposed his penis and masturbated in front of them.

b. Dingle told Charging Parties and members of the Class that their jobs were dependent upon them having sex with him or that they could be promoted if they had sex with him.

c. On or around November 13, 2017, Dingle forced Coleman to have sex with him. Dingle threatened Coleman that she could only continue to work if she had sex with him. Specifically, Dingle took Coleman to a washroom on the Kimball and told her that it was his ship and that she needed to "get with the program." When she asked him "what program?" he said she had to "f**k me to keep your job" and forced her to have sex with him.

d. Dingle made sexual comments to Coleman multiple times daily such as "you look so fine in those jeans;" or "you fine as a mother-f**ker; you wearing them jeans aren't you;" or "ooo that ass so fat, if I could touch that" or "I had to come see your sexy ass; you so fine." Dingle would grab her buttocks and say, "Let me just touch it." Coleman did not welcome this conduct.

e. Dingle made similar comments to Sellers when she entered the Kimball to work each morning and multiple times throughout the workday. He made comments such as, "y'all fine; sure are some pretty looking women" or "let me eat that p*ssy one time" or "I sure would like to taste that" or "booty looking big today in them pants" or "oh, I sure like to taste that p*ssy" or "when you gonna let me take you out." Dingle called her "honey" or "sweetheart" rather than address her by her name. Sellers did not welcome this conduct.

f. Dingle masturbated in front of Coleman on at least three occasions and in front of Sellers on at least one occasion. On one occasion, Dingle summoned Coleman to a storeroom and

10

Sellers came with her for protection. When they entered, Dingle had already exposed his penis and was masturbating.

      g.      On multiple occasions, Dingle looked at Sellers and the Class in a sexual manner while pulling his pants tight across his groin to show his penis was erect or while touching his penis.

      h.      Dingle told a member of the Class that she could only keep her job if she had sex with him. He also told her she could be promoted to a supervisor if she would have sex with him. Dingle also rubbed against her and grabbed her buttocks. Dingle masturbated in front of her and said, "You know you want this dick," and "I can make you leave your husband." This Class member was also aware of Dingle constantly sexually harassing other female employees in the same manner, including pressuring them to have sex with him. This Class member did not welcome this conduct.

      i.      Dingle sought out Charging Parties and the Class when they were working alone or working only with other females whom he had previously harassed so he could touch them or make sexual comments without interference.

      j.      Charging Parties and the Class were aware that Dingle had an ongoing sexual relationship with another female employee of NSC assigned to their cleaning crew, April Mitchell. Dingle and Mitchell would often have sex in the Captain's room of the Kimball. Mitchell once questioned Coleman how to give oral sex because Dingle demanded it. Charging Parties would cover Mitchell's cleaning duties while she had sex with Dingle because it temporarily kept Dingle from sexually harassing them. Defendants were aware of Dingle's sexual misconduct with and toward Mitchell and other female employees but did nothing to stop it. Dingle's conduct was open and pervasive and well-known to Defendants.

11

k.	Charging Parties and the Class were afraid to work around Dingle and told their immediate supervisor, James Willis. Willis was hired by NSC and assigned as the lead cleaning crew member at the shipyard. If they knew they had to work around Dingle, Charging Parties went together or asked Willis to work closely with them to protect themselves from Dingle. Willis was well-aware of how Dingle harassed the Charging Parties and the Class.

l.	Following a work break during December 2017, the NSC cleaning crew returned to work at the shipyard. Willis remarked to Coleman that she had "made the cut" to return to work. Coleman reported to Willis that Dingle forced her to have sex to keep her job. Willis replied, "Sometimes you have to do what you have to do to keep your job."

m.	Willis reported Coleman's complaint to NSC's Branch Manager, Ty Collard. Collard took no action to investigate Coleman's complaint and told Willis he was concerned about NSC keeping its contract with Huntington Ingalls.

n.	On or around April 5, 2018, Dingle followed Sellers into a room and said, "Oh I got you by myself now." He then pinned her to the corner of the room and groped her. He told her, "You are going to have to give me some of that p*ssy if you want to keep your job." Coleman walked in and witnessed this event. Sellers refused to have sex with Dingle.

o.	Later the same day, Dingle demanded to replace Sellers on the cleaning crew and requested that Mitchell take her place. Defendants unlawfully retaliated against Sellers by terminating her employment after she refused to have sex with Dingle.

p.	On or around April 6, 2018, Sellers reported Dingle's harassment to NSC Recruiter Alexandria Rucker. In addition to complaining that she had been fired for refusing to have sex with Dingle, Sellers reported that Dingle had previously sexually assaulted Coleman and told Coleman she had to have sex with him in order to keep her job. Sellers also asked Rucker how to

contact Collard so she could report the harassment. Rucker acknowledged that she knew other female employees had made similar complaints but that there was nothing she could do and emphasized that Sellers should not do anything that would cause NSC to lose its contract with Huntington Ingalls. Rucker refused to give Sellers a phone number to reach Collard. Sellers got Collard's number from Willis and reported to Collard the same complaints she had reported to Rucker. Collard reiterated it was important not to lose the contract and did not take any action to investigate or otherwise protect the female employees still working at Huntington Ingalls under Dingle.

    q.    After seeing that NSC would not protect them, Sellers contacted Huntington Ingalls' Human Resources Department and first learned of the Huntington Ingalls Hotline. Sellers reported these same complaints to the Huntington Ingalls Hotline.

    r.    On or around April 12, 2018, Coleman called the Huntington Ingalls Hotline to report that, on a near daily basis since Sellers called the Huntington Ingalls Hotline on April 6, 2018 Jason LNU, who was Dingle's boss, had retaliated against her because she was a witness to Dingle's harassment of Sellers. She also reported that starting from October or November 2017, Dingle sexually harassed her and Sellers by inappropriately touching them and telling them they would lose their jobs if they did not engage in sexual relations with him.

    s.    Subsequently, Coleman called to follow up with the Huntington Ingalls Hotline several times, including to report that on April 19, 2018 Dingle continued to harass her by stating, "you still sexy than a mother**ker."

    t.    Dingle did not treat male employees on the Kimball in the same manner he treated female employees as described above.

24. After April 5, 2018, neither NSC nor Huntington Ingalls rehired Sellers.

25. On April 24, 2018, Dingle called Coleman over and told her that he knew she had been talking too much about him and, "If I lose my job, b*tch, you gonna lose your life." Coleman immediately reported this threat to the Huntington Ingalls Hotline.

26. After Charging Parties complained to their immediate supervisor Willis about Dingle's sexual harassment, NSC took no action to investigate their complaints or protect them from continuing harassment.

27. After Charging Parties complained about Dingle to Rucker and Collard, NSC made no effort to investigate their complaints, interview other female employees to verify they were not also being harassed or notify Huntington Ingalls that its high-level supervisor was sexually harassing female employees.

28. After Charging Parties reported Dingle to the Huntington Ingalls Hotline, Huntington Ingalls permitted Dingle to continue to work around Coleman and other female employees, which allowed him to continue harassing them and gave him the opportunity to threaten Coleman's life.

29. In addition to failing to provide a workplace free from sexual harassment, Defendants also unlawfully retaliated against Sellers when they terminated her employment for opposing the unlawful sexual harassment.

30. Huntington Ingalls also unlawfully retaliated against Coleman when its supervisor threatened her life because she opposed his unlawful conduct.

31. The effect of the practices complained of above has been to subject Charging Parties and the Class to a hostile work environment based on their sex (female).

32. The harassment described above was severe, ongoing, and pervasive.

33. Defendants knew or should have known Dingle was creating a hostile work environment as described above but failed to take prompt, effective action to prevent or stop it.

34. The unlawful employment practices complained of above were intentional.

35. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Charging Parties and the Class.

## **PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court:

A.  Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in sexual harassment and retaliation.

B.  Order Defendants to institute and carry out policies, practices, and programs which provide a workplace free from sexual harassment and retaliation, require employees, managers, and officers to undergo training on preventing and recognizing sexual harassment and retaliation, provide multiple avenues for employees and customers to report sexual harassment and retaliation, and train managers and officers to promptly act to remedy sexual harassment and retaliation.

C.  Order Defendants to make whole Charging Parties and the Class, by providing, as appropriate, compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

D.  Order Defendants to pay to Charging Parties and the Class punitive damages for its malicious and reckless conduct described above, in amounts to be determined at trial.

E.  Order Defendants to make Sellers whole by providing appropriate backpay with prejudgment interest, and appropriate compensation for the past and future pecuniary losses resulting from their unlawful employment practices, including but not limited to relocation expenses, job search expenses, and other pecuniary losses, in amounts to be determined at trial

  F. Order Defendants to provide other affirmative relief necessary to Sellers to eradicate the effects of their unlawful employment practices, including but not limited to reinstatement or front pay in lieu thereof.

  G. Grant such further relief as the Court deems necessary and proper in the public interest.

  H. Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

Respectfully submitted,

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br>Office of the General Counsel<br>131 M Street NE, Fifth Floor<br>Washington, DC  20507 | Christopher Lage<br>Deputy General Counsel |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br>Birmingham District Office<br>Ridge Park Place, Suite 2000<br>1130 22nd Street South<br>Birmingham, Alabama  35205 | Marsha L. Rucker<br>PA Bar No. 90041<br>Regional Attorney<br>marsha.rucker@eeoc.gov<br>(205) 651-7045<br><br>Gerald L. Miller<br>AL Bar No. asb-1454-E52G<br>Supervisory Trial Attorney<br>gerald.miller@eeoc.gov<br>(205) 651-7026<br><br>Gina E. Pearson<br>AL Bar No. asb-3971-h61g<br>Trial Attorney<br>gina.pearson@eeoc.gov<br>(205) 651-7049 |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br>Mobile Local Office<br>63 South Royal Street, Suite 504<br>Mobile, AL  36602 | /s/ Trent Thompson<br>Wm. Trent Thompson<br>NY Bar No. 5232525<br>Trial Attorney<br>william.thompson@eeoc.gov<br>(205) 651-7065 |

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing was filed electronically on February 3, 2022. Notice of this filing will be sent by operation of the Court's electronic filing systems to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ <u>Trent Thompson</u>
Wm. Trent Thompson
